**STATE of Missouri, Respondent,**

v.

**Vernon BROWN, a/k/a Thomas Turner, Appellant.**

No. 73575.

Supreme Court of Missouri,
En Banc.

Aug. 3, 1999.

Rehearing Denied Sept. 7, 1999.

Loyce Hamilton, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

MICHAEL A. WOLFF, Judge.

In 1991, appellant Vernon Brown (also known as Thomas Turner) was convicted of murder in the first degree and sentenced to death. Brown filed a motion for post-conviction relief and the motion was overruled. Brown appealed to this Court. On September 12, 1997, this Court issued a per curiam remanding this case to the trial court for "gender-*Batson* hearing." *State v. Brown*, 958 S.W.2d 553 (Mo. banc 1997). On November 23, 1998, the hearing court held a gender-*Batson* hearing. After hearing, it rejected Brown's gender-*Batson* challenge. This Court has jurisdiction in Brown's consolidated appeal. Mo. Const. art. V, section 3. We affirm.

### Facts

In 1986, Brown was charged by indictment with murder in the first degree. Brown and his wife, Kathy Moore, lived in an apartment at 3435 Washington in the City of St. Louis. Brown worked in that apartment complex as a maintenance worker, and he also worked next door at the Grand Cafe on Washington as a dishwasher. Brown and his wife moved to 4028 Enright after February 13, 1985. A few days later, the victim, Synetta Ford, moved into a basement apartment of the building at 3435 Washington. Ford's roommate was Alesia Brown.

On February 23 or 24, 1985, Alesia Brown, Synetta Ford, Earl Bedford and Vernon Brown played cards together in Ford's apartment. Bedford testified that Brown flirted with the victim, Ford, but she appeared not to be interested.

On February 28, 1985, Alesia Brown checked into a hospital for about ten days because she was pregnant. Prior to her admission into the hospital, Alesia had discussed with the appellant the possibility of him working on their apartment rug and vent. Brown went to the victim's apartment to take up the rug on March 2nd and 4th, but the victim told him to wait until her roommate, Alesia Brown, came back from the hospital. On March 5, 1985, the victim called her friend, Vickie Noland, she spoke very fast, and she asked Noland to "come get me now." Ford told Noland that she was afraid because she came home and found Brown on the stairway near the entrance of her apartment. Noland picked Ford up at about 2:35 p.m., and she spent the night with Noland. The last time that Noland saw Ford was when Ford left for work, on the morning shift at Victor Foods, at about 4:30 a.m. the next morning.

Alesia Brown's brother, Anthony Brown, works with Ford at Victor Foods. Anthony Brown testified that he last saw Ford on Wednesday, March 6, 1985, between 3:30 p.m. and 3:45 p.m. at Victor Foods. He testified that he spent the night with Ford on Tuesday night at her apartment, and she had told him about her encounter with the maintenance person.[1]

On March 7, 1995, at about 10:30 a.m., Brown arrived at the Grand Cafe on Washington and told a chef that he was sick and did not want to work. The chef told him to go home and come back the next day if he felt better.

On March 8, at about 4:00 p.m., Alesia Brown was picked up from the hospital by Earl Bedford. When they arrived at her apartment, which she shared with Ford, she unlocked the front door. When they arrived at the door that led to the apartment, they found out that the door was shattered from the frame. Upon entering the apartment, they observed Ford's body on the floor with a cord around her neck and a knife in her throat. They ran out and called the police.

After they returned to the front of the apartment building, people, including Brown, began to gather. Brown asked Alesia Brown what happened, and she replied that she found her roommate dead. Brown appeared surprised. Brown was interviewed by the police at the crime scene. Brown told the police that he moved out of the apartment building where the victim lived three weeks earlier, but that he still received mail there. Brown alleged that he stopped by to pick up some mail at about 10:15 a.m. on March 7, and he heard Ford arguing with a Cuban man. Brown gave the police a description of the purported Cuban man.

When Brown arrived home, he told his wife that Ford had been found dead. Initially, his wife was in disbelief. Later, Brown told her that he killed Ford. Brown's wife testified that Brown told her that he and Ford got into a fight over money and that Ford threatened to tell that they were having an affair. After Ford left the apartment, Brown went inside and hid in the bathroom. After Ford returned and changed into her nightclothes, he came up behind her and wrapped a cord around her neck. According to Brown, they got into a scuffle over a knife, and he took the knife away from the victim and stabbed her in the neck with it. Brown then kicked in the door to make it look like someone broke into the apartment.

Brown was interviewed by the police on March 9, 22, and 26. Brown told his wife that he was tired of the police bothering him about Ford's murder. On March 28, 1985, Brown packed his clothes and left town. He told his wife to tell the police that he had been abducted by three men, dressed in black and carrying guns, in a

---

1. There appears to be a conflict between Vickie Noland's and Anthony Brown's testimonies regarding who spent the night with the vic- tim. However, this discrepancy does not appear to have affected the outcome of the trial.

red Pinto down the street. On April 1, 1985, Brown's wife told the police the above story when they came looking for Brown. On April 2, 1985, Brown's wife told them that the story about the abduction was not true and that she wanted to be a secret witness because she was afraid of Brown. She told the police that Brown told her that he killed Ford and told them how Brown killed Ford.

On April 24, 1985, Brown was arrested pursuant to a warrant, taken to the police station and was given his *Miranda* rights. Brown told them the abduction story. The police told him that they did not believe him because his wife had told them the truth. About fifteen months later, on October 29, 1986, Brown confessed to the murder of Ford. Brown said that around 10:00 a.m. on March 7, 1985, he left home and headed for his place of work at the Grand Cafe. When he arrived at work he told the cook that he was not feeling well, and the cook told him that he could go home. Instead, Brown went to 3534 Washington. Brown went to the basement. He said that he saw Ford standing in the door way to her apartment and that Ford asked him what he was doing there. Brown replied, "I'm getting a pair of gloves." According to Brown, as he walked up the stairs, she attacked him with a butcher knife. They began to tussle and ended up in the apartment. As Ford swung the knife at him, she accidentally stabbed herself in the chest. As he tried to leave, she removed the knife from her chest and attacked him the second time. Then, he grabbed an electric curling iron, wrapped its cord around Ford's neck several times, and tied a knot in the cord. They wrestled, falling to the ground, and in their struggle the victim stabbed herself in the throat with the knife. He got up and left Ford's apartment. When he reached the top of the steps, he realized that he had left his keys inside Ford's apartment. Brown kicked in the door, went back inside Ford's apartment, got his keys, and then left.

The autopsy that was performed indicated that Ford died from strangulation. The autopsy also revealed that Ford was stabbed twice, once in the chest and once in the neck.

Brown raises the following points on appeal.

## Juror Conduct and Adequate Hearing

■ Brown contends that the trial court erred when it overruled his motion for a full and fair hearing to determine whether venirepersons were biased against him and whether juror misconduct had occurred. Brown alleges that a venireperson Kathy H. reported to the court that she had discussed the case with fellow venirepersons, researched Brown's case during voir dire, overheard a male venireperson advising how to get excused from the jury, and overheard other venirepersons discussing Brown's guilt or innocence.

The trial court conducted a juror misconduct hearing for the parties to question the venireperson, Kathy H. Brown contends that the trial court conducted inadequate juror misconduct hearings. Brown moved to "quash whatever jurors have been questioned and whatever jurors have been called in this case .... on the grounds that there is juror misconduct going on all over the place." The trial court overruled the motion, finding Kathy H. not credible. The trial court found that Kathy H. admitted that she lied about the number of people she had contact with. Kathy H.'s story about one "Debbie" was refuted by the record. The trial court did not believe that Kathy H. did not understand that she was not supposed to the discuss the case.

Brown says the trial court erred by not granting him individual questioning of jurors during voir dire. Brown had moved to question the venirepersons from the first group of 75 individually and outside each other's hearing. Individual questioning was denied, but Brown was allowed to question the venirepersons in panels of six.

No venireperson acknowledged that he or she was aware of any misconduct.

Brown further contends that the trial court erred because it failed to recall about 35 venirepersons who were stricken for cause based on their inability to vote for death under any circumstances. He argues that it suggests that Kathy H.'s allegations about the existence of a certain man advising venirepersons as to methods of avoiding juror service are correct.

■ A trial court's decisions concerning juror misconduct will not be disturbed unless there is abuse of discretion. *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997). The trial court abuses its discretion when its ruling is clearly against logic of circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.* at 883–884. The trial court did not abuse its discretion. The trial court found venireperson Kathy H., prime source of the misconduct allegations, incredible and impugned her integrity. *State v. Wise*, 879 S.W.2d 494, 506 (Mo. banc 1994). The record does not substantially support the assertion that the venirepersons were exposed to improper communications. Brown was not prejudiced by the actions of the trial court.

■ Brown further alleges that Kathy H. indicated that she and other venirepersons she had spoken with were confused by whether MAI – CR3d 300.04, which was read to them before each recess, applied to them before they were selected to be on the jury. Brown had submitted a proposed non-MAI instruction, which the trial court denied. MAI – CR3d 300.04 sufficiently addresses the venirepersons. Where an applicable MAI – CR instructions exists, the court is required under Rule 28.02 to submit that instruction.

*State v. Roberts*, 948 S.W.2d 577, 603 (Mo. banc 1997).

### The Strikes for Cause

■ Brown contends that the trial court erred in overruling his motion to strike for cause venirepersons Ann S., John S., and Joan T. Ann S. and John S. did not serve on the jury because Brown used his peremptory strikes on them. Section 494.480.4, RSMo 1994,[2] provides:

The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.

Brown was tried in 1991. Section 494.480.4 was amended, effective August 28, 1993. Brown contends that this amended provision has not been applied to cases tried before the effective date of the statute and decided on appeal after August 28, 1993. Brown's argument is not persuasive. In *State v. Gray*, 887 S.W.2d 369, 383 (Mo. banc 1994), this Court stated:

The new statute [section 494.480.4] is procedural in nature and was effective prior to the appeal of this case. Application of the statute does not violate the prohibition against ex post facto laws.... Because the two venirepersons did not serve as jurors, there is no reversible error.

■ Furthermore, Brown alleges that Joan T. was not qualified to serve on the jury because her responses were equivocal. Joan T. stated that she would consider the full range of punishment and said that she understood that the state has the burden of proof. Joan T., after hearing that Brown was on death row for the murder of Janet Perkins, stated that she would not make a decision until all the evidence was in. Although she stated that she leaned

**2.** All statutory references are to RSMo 1994, unless otherwise indicated.

towards the death penalty, she also stated that she could consider life. She indicated that Brown did not have the burden of showing that a life sentence was appropriate, but that she would like for Brown to prove why he should not receive the death penalty. On further questioning, Joan T. said that she understood that Brown did not have to prove anything. The qualification of Joan T. is not determined conclusively by a single response but is made on the basis of the entire examination. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). The trial judge is in the best position to evaluate the venireperson's commitment to follow the law contained in the instructions. *Id.* Based on Joan T.'s answers, we conclude that the trial court did not abuse its discretion in overruling Brown's motion to strike Joan T. for cause.

### The *Batson* Challenges

Prior to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), no reason needed to be given for using a peremptory challenge to a particular member of the venire. Traditional trial preparation often involved lawyers deciding in advance, by factors that included race and gender, what kinds of jurors they wished to eliminate.[3] These factors also include job, age, neighborhood, religion, socio-economic status and other characteristics, in addition to the prospective jurors' answers to voir dire questioning. *Batson* prohibited peremptory strikes based on race. In *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Supreme Court extended the *Batson* prohibition to strikes based on gender. The *Batson* doctrine's unassailable purpose, however, conflicts with the traditional notion and practice of peremptory strikes. The principle is easier to state than to follow. We have a procedure for a trial judge to assess whether race or gender was the real reason for the strike, but

ultimately [We] leave to the trial judge, as finder of fact, to discern whether or not race or gender discrimination was involved. The trial court's determination is a finding of fact that will not be overturned on appeal unless clearly erroneous. *State v. Barnett*, 980 S.W.2d 297, 302 (Mo. banc 1998)

In Missouri, if the appellant wishes to challenge the state's peremptory strike, the appellant must first raise the challenge by identifying the cognizable racial or gender group to which the stricken venireperson belongs. *State v. Jones*, 979 S.W.2d 171, 185 (Mo. banc 1998). The trial court will require the state to give an explanation that is neutral as to race or gender for striking the venireperson. *Id.* Then, the defendant has the opportunity to show that the proffered reasons are merely pretextual and that the strike is actually based on race or gender. *Id.* The justification for a peremptory strike need not rise to the level of justification for a challenge for cause. *Id.*

In many instances, the defense will have no evidence of race or gender discrimination, but may rely on the argument that the prosecutor's proffered reason is preposterous and, thus, pretextual, or the argument that the prosecutor's stated reasons are so rife with racial or gender stereotyping as to constitute evidence of discrimination. Or, the defense may argue that African–Americans or women were eliminated by peremptory challenges, where similarly situated whites or males were not. As stated, we rely on the trial judge's role as fact-finder, and the judge's finding will not be overturned on appeal unless clearly erroneous. *State v. Brooks*, 960 S.W.2d 479, 488 (Mo. banc 1997).

In this case, the *Batson* challenges based upon race were made and ruled upon at the original trial. While the ap-

---

**3.** In Clarence Darrow's 1936 essay on selecting a jury, reprinted in Jeans, *Trial Advocacy*, 2d. Edition, (West 1993) pp. 275–280, the comparative merits of jurors of various char-

acteristics are compared, and Darrow concludes that women jurors "were absolutely dependable, but I did not want them." *Id.* at 280.

peal was pending in this Court, the United States Supreme Court extended *Batson* to gender bias in the *J.E.B.* case. When we remanded the case for the trial court to decide the issues as to alleged gender discrimination, the original trial judge had retired and the matter was assigned to a different judge. At the hearing on remand, which occurred about seven years after the original trial, the prosecutor reconstructed from his trial notes the reasons for strikes and articulated neutral reasons for his decisions. The trial judge found no discrimination and, according his findings the deference they are due, we find no error. We review the findings as to race—ruled upon at trial—and gender— heard and ruled upon at the remand hearing. Our analysis follows.

### A.

### Peremptory Strikes of African–Americans

Brown contends that the trial court erred when it overruled its objections to the prosecutor's use of its peremptory strike to strike five African–Americans. Brown alleges that the prosecutor pretextually struck the African–Americans without a race-neutral reason. After the state's peremptory strikes were made, Brown unsuccessfully asked the court to quash the jury panel because the strikes were made in a racially discriminatory manner.

### Venireperson Charles M.

 The state proffered that Charles M. was convicted of a felony charge of passing a bad check and was on probation. In addition, the prosecuting attorney stated that Charles M. "claims he doesn't even remember that it was my office, the Circuit Attorney's Office, that prosecuted him and my colleague, Jeff Jamieson, that tried to put him in jail for seven years." The state also struck Charles M. because he was equivocal during death qualification, in that he stated that he could not impose death and later stated that he could impose death. Brown contends that there

are similarly situated white venirepersons who were not struck by the state. According to Brown, venireperson Jeff R., a white male, was currently on probation for a felony. Brown further alleges that venireperson Joan T., a white female, was on probation for two years before the trial, for writing bad checks. In addition, Brown contends that venirepersons Virginia C. and Mary Elizabeth R., white females, were equivocal in their responses but were not struck.

 In determining whether the prosecutor struck a venireperson because of his or her race, the trial court looks at the totality of the facts and circumstances surrounding the case. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). The existence of similarly-situated white jurors is probative of pretext under *Batson* analysis, but it is not dispositive, in determining whether use of peremptory challenges is discriminatory. *State v. Nicklasson*, 967 S.W.2d 596, 613 (Mo. banc 1998). In this case, the venirepersons that Brown has listed may have one factor or the other in common with Charles M., but none has all the factors that the prosecutor listed against Charles M. Thus, the trial court concluded, they are not really similarly situated, and furthermore, the reasons proffered by the prosecutor are sufficiently race-neutral and nonpretextual. Thus, we defer to the trial court's ruling denying Brown's challenge. *See State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995).

### Venireperson Mamie D.

 The state struck Mamie D. because of its concern regarding her unequivocal statement during death qualification that "I prefer life without parole to death." During questioning Mamie D. indicated that she had a strong preference for life and that she does not care about death. She stated that she "wouldn't vote for the death penalty unless it was without a shadow of doubt." Later, after hearing that Brown was on death row for the

murder of Janet Perkins, she stated that she would want death if it were her daughter.

 The Constitution requires that the defendant be afforded an impartial trial. *State v. Nicklasson,* 967 S.W.2d 596, 610 (Mo. banc 1998). A potential juror is not impartial if the juror will automatically vote for the imposition of the death penalty without regard to evidence or legal instructions. *Id.* Conversely, a juror is not impartial if the juror will automatically vote for the imposition of life without regard to evidence or legal instruction. If the potential jurors' views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths, the jurors are not impartial. *Id.* Mamie D.'s responses to the imposition of sentence without regard to the evidence is a sufficient race-neutral reason for the trial court to deny Brown's challenge.

### Venireperson Willie Mae R.

 The prosecutor struck Willie Mae R. because of the following:

[THE PROSECUTOR]: Your Honor, regarding Juror No. 162, Mrs. Willie Mae [R.], Miss [R.], again, I struck because of her feelings about the death penalty. I moved – I originally recorded that she said unequivocally that she would not impose the death penalty. She was rehabilitated by Ms. Kraft. She was left on the jury despite my protestation that she should be removed. I have that when Ms. Kraft questioned her about the death penalty Miss [R.] responded quote "Not now, I don't think I could" and then she stopped talking and when I asked her what she meant when she said quote "Not now, I don't think I could" unquote she responded that she was talking about the death penalty and then after a great deal of extreme confusion in which Miss [R.] came down on all sides of the issue she finally very angrily insisted that "Well, I guess I could consider it, you know, I

you're confusing me but I guess I could" I believe were her words.

THE COURT: Karen, do you have any comment?

[DEFENSE COUNSEL]: No, Judge.

THE COURT: Very well. Let the record show that the Court finds beyond a reasonable doubt that the striking of by the State of Willie Mae [R.] was done on a racially neutral basis and therefore did not violate the precepts of *Batson v. Kentucky.*

On a *Batson* challenge, the state's reasons for strike need only be facially race-neutral unless discriminatory intent is inherent within the explanation. *State v. Brooks,* 960 S.W.2d 479, 488 (Mo. banc 1997). The explanation will be deemed race-neutral, even if it is not persuasive. *Id.* When faced with a *Batson* challenge, the state must present a reasonably specific and clear race-neutral explanation for the peremptory strike. *State v. Morrow,* 968 S.W.2d 100, 113 (Mo. banc 1998). If the state does this, then it is the defendant's burden to show that the state's reasons were pretextual and that strikes were racially motivated. *Id.* Here, the state presented its reason for striking Willie Mae R., and Brown did not bear his burden by rebutting the explanation.

### Alternate Venireperson Marvin B.

 The prosecutor stated that Marvin B. was struck because of his attitude. According to the prosecutor, Marvin B. did not pay attention, he made goofy faces, he showed an inappropriate amount of levity, and he did not seem to take the whole proceedings with much seriousness. Even the court noted:

THE COURT: Well, let me say this, I guess in *Batson v. Kentucky* the Court is allowed to make observations of prospective jurors and I did notice Mr. Brown. He did display a lackadaisical attitude throughout the questioning of the jury panel, one that showed an attitude that showed complete indifference

to the dignity and the seriousness of the matter under consideration by the Court.

I did not feel that it would be proper for the Court to dismiss the juror but I could certainly see as a trial lawyer that I wouldn't particularly care to have such a person on my jury so I find beyond a reasonable doubt and without qualifications and within my own perspective and viewpoint or view, rather, that neutrally racial considerations were adhered in the striking of Mr. Brown.

Inattentiveness has been considered a racially-neutral reason for exercising a peremptory challenge. *State v. Antwine*, 743 S.W.2d 51, 67 (Mo. banc 1987); *State v. White*, 913 S.W.2d 435, 437 (Mo.App.1996).

### B.

### Peremptory Strikes of Women

Brown contends that the trial court erred when it overruled his objections to the state's use of ten of its twelve peremptory strikes to strike women from the jury panel, in failing to allow a hearing to determine if the state discriminated against women in the use of its peremptory strikes, and in failing to require the state to give gender neutral reasons for the strikes. There were seven females and five males that sat on the jury that convicted Brown. As noted, prior to issuing an opinion on the other briefed issues, this Court remanded Brown's appeal to the Circuit City of St. Louis City for a gender *Batson* hearing. *State v. Brown, supra,* 958 S.W.2d 553. After the remand, Brown challenged the state's use of five peremptory challenges against females. The hearing court denied Brown's challenges. We uphold the hearing court's conclusions.

### Venireperson Joanne J.

■ The prosecutor stated that he struck Joanne J. because she stated that she thought that life without parole was worse than the death penalty. Brown objected claiming that a male juror, Jeff R.,

had stated that he thought that life without parole was as bad as the death penalty. The trial court found that Jeff R. was not similarly situated to Joanne J. in that their statements showed that they had different values. While the existence of similarly situated male jurors who were not struck is some proof of pretext, it is not dispositive. *State v. Barnett,* 980 S.W.2d 297, 302 (Mo. banc 1998). The above reason is sufficiently gender-neutral and nonpretextual, and we defer to the hearing court ruling. *See State v. Jones,* 979 S.W.2d 171, 184 (Mo. banc 1998).

### Venireperson Mary Patricia M.

■ The initial reason given by the prosecutor for striking Mary Patricia M. was that he did not like her attitude toward the death penalty because she had indicated that she leaned towards life. When Mary Patricia M. was asked whether she could consider a life sentence, she emphasized that she could without a doubt. Brown objected and indicated that there was nothing in the record to show that Mary Patricia M. said anything about leaning towards life. Then, the prosecutor stated that his second reason is because of Mary Patricia M.'s occupation. The prosecutor stated:

> Ms. [Mary Patricia M.'s] listed her occupation as health educator; in response to a question at the time of voir dire said she had been in community education for five years. As a general rule, as a prosecutor now for 15 years I have always thought that those who were in helping, caring professions such as people who work for the department of social services or in some similar capacity are frequently not good bets as prosecution venirepersons. So part of my reason for striking Ms. [Mary Patricia M.] related to her occupation as well as what I perceived as her inclination against the death penalty.

Peremptory strike of a venireperson because of employment has been held to be acceptable. *See State v. Jones,* 979 S.W.2d

171, 185 (Mo. banc 1998). The reason is sufficiently gender-neutral as to support the denial of Brown's challenge.

### Venireperson Mamie D.

 At the remand hearing, the prosecutor stated the following as his reasons for striking Mamie D.:

> I had again multiple reasons for striking Ms. [Mamie D.], but the first that caught my eye was that she said during voir dire that her brother had been arrested on a drug case, that he was in and out of court on quite a few occasions and this was what I thought was conclusive. She said that she went to court with him when he was being prosecuted on a drug crime, I believe here in the Circuit that includes the City of St. Louis. According to my notes, she indicated at least to me that she had a preference for life without parole as opposed to death. Those are the reasons that I struck Ms. [Mamie D.].

Brown responded by alleging that there were other male venirepersons who were not struck, but were similarly situated. The hearing court found that the state has articulated sufficient gender-neutral reasons for peremptory challenge of Mamie D. We find that the trial court did not clearly err in rejecting Brown's challenge. *See State v. Brooks,* 960 S.W.2d 479, 488 (Mo. banc 1997).

### Venireperson Leslie W.

 The prosecutor struck Leslie W. because of her occupation and her husband's occupation. Leslie W. and her husband are artists. The prosecutor thought that she impressed him as a person with an artistic temperament. Leslie W. also was a telemarketer and telemarketers, according the prosecutor, are inclined to have many abrasive contacts with the criminal justice system or they know someone who has. In addition, the prosecutor stated that she was shaky on the death penalty. Peremptory strikes can be based on occupation, so long as they are race and gender-neutral. *See State v. Jones,* 979 S.W.2d 171, 185 (Mo. banc 1998); *State v. Morrow,* 968 S.W.2d 100, 114 (Mo. banc 1998); *State v. Nicklasson,* 967 S.W.2d 596, 614 (Mo. banc 1998). The reasons proposed by the prosecutor are sufficiently gender-neutral to support the trial court's ruling against Brown's challenge.

### Venireperson Kathleen P.

 The prosecutor stated the following reason for striking Kathleen P.: YOUR HONOR, concerning Venireperson Kathleen [P.], Juror No. 170, I earlier observed of this juror, I believe in the context of Batson race neutral hearing, that I thought her attitude was inappropriately casual and lackadaisical. In that when asked about the death penalty, according to my notes and recollection, she first said, well, if a defendant poses any danger, then the death penalty might be what he deserves, which is a qualification I wasn't comfortable with because almost by definition if somebody is going to be in prison for life without parole, they no longer constitute a danger.

And the first thing I recall her saying about that was that if someone constitutes a danger, that might be what he deserves. And then when Ms. Kraft asked could you consider life without parole, she said she thought that might be appropriate, quote-unquote.

Her attitude of casually flipping back and forth as if life or death were not a matter of great concern for her as to which was chosen caused me to think that she didn't regard the proceedings with the appropriate seriousness. I felt that she was flaky and that her responses were not credible. And since the prosecution must get all twelve, I didn't want someone who seemed to be eccentric and overly casual on the jury, and that was my reason for striking this potential alternate juror, Kathleen [P.], your honor.

Inattentiveness, demeanor and attitude are proper gender-neutral explanations. *State v. Antwine,* 743 S.W.2d 51, 67 (Mo. banc 1987); *State v. White,* 913 S.W.2d 435, 437 (Mo.App.1996).

### Individual Voir Dire and Sequestration of Venirepersons

Brown contends that the trial court erred by overruling his motion to grant individual voir dire and sequestration of the jury during voir dire because of the extensive publicity about his conviction and sentence of the murder of Janet Perkins. *State v. Brown,* 902 S.W.2d 278 (Mo. banc 1995). The control of voir dire is within the discretion of the trial court; only abuse of discretion and likely injury will justify reversal. *State v. Chambers,* 891 S.W.2d 93, 102 (Mo. banc 1994). A defendant is not automatically entitled to individual voir dire in death penalty cases, and it is left to the trial judge to deal with problems of pretrial publicity. *State v. Smulls,* 935 S.W.2d 9, 19 (Mo. banc 1996); *State v. Weaver,* 912 S.W.2d 499, 522 (Mo. banc 1995). In this case, the venirepersons during voir dire were asked whether they had heard about anything in the media about the appellant. The venirepersons who had heard about Brown were individually questioned at the bench out of the hearing of the other venirepersons. The trial court's conduct was appropriate as to those prospective jurors who had been exposed to media coverage about Brown. Thus, we find no abuse of discretion or any injury from the actual voir dire. In the circumstances of this case, refusal of sequestration of venirepersons was not error. *See State v. Johns,* 679 S.W.2d 253, 265 (Mo. banc 1984).

### Whether Victim's Statements Were Hearsay

Brown contends that the trial court erred by overruling his objection to the testimony of Vickie Noland and Anthony Brown concerning statements made by Ford because those statements were inadmissible hearsay. Noland testified that on March 5, 1985, Ford had called her and asked Noland to come and pick her up. Noland testified that Ford was speaking very fast and told her that she was afraid of Brown because she came home and found Brown on the stairway right before the entrance of her apartment. Anthony Brown also testified that Ford had told him on March 5, 1985, that she was afraid of defendant Vernon Brown because Brown had been in a place close to her apartment where he was not supposed to be.

Out-of-court statements offered to prove knowledge or state of mind of the declarant are not hearsay. *State v. Basile,* 942 S.W.2d 342, 357 (Mo. banc 1997). Such statements are admissible if relevant. *State v. Bell,* 950 S.W.2d 482, 483 (Mo. banc 1997). The state offered this testimony to show Ford's state of mind regarding her fears about Brown and not to show the truth of the matter being asserted. The hearsay declarations of a victim's state of mind are particularly relevant where the defendant has put the victim's mental state at issue by claiming accident, self-defense or suicide. *State v. Shurn,* 866 S.W.2d 447, 458 (Mo. banc 1993). In this case the testimony's probative value also outweighs its prejudicial effect. Brown confessed that Ford allegedly attacked him and accidentally stabbed herself in the chest and in the neck. Thus, the trial court did not err in admitting the testimony.

### Right to Counsel and Confession

Brown contends that the trial court erred in denying his motion to suppress statements he made about the murder of Synetta Ford in the guilt phase and the murder of Janet Perkins in the penalty phase. He alleges that the statements were obtained in violation of his constitutional rights in that the state questioned him without contacting his attorney and that his confession was not voluntary, in-

telligent and knowing because he was high on drugs.

Brown made the same argument in *State v. Brown,* 902 S.W.2d 278, 291 (Mo. banc 1995), where he contended, among other things, that the trial court erred in admitting his confession to the murder of Synetta Ford because the police illegally obtained the confession about Ford's killing by interrogating him without the presence of his attorney. *Id.* The Court rejected his claim. *Id.* However, Brown respectfully requests that this Court reconsider its holding in that case with respect to this issue. Brown has previously litigated the validity and admissibility of his confession, and we see no need to revisit the issue.

Because the confession to the killing of Synetta Ford is the basis for this conviction and death penalty, we will, however, consider whether his confessions and waivers of his rights were involuntary, unintelligent or unknowing because he was under the influence of drugs or alcohol. Brown alleges that his defense attorney, who interviewed him on October 29, 1986, had difficulty interviewing him because of his drug intoxication. However, the record indicates that Brown was repeatedly informed of his *Miranda* right before his confessions. He repeatedly asserted that he understood his rights and signed written waivers of his rights. Toward the end of his confession, he said that he was not under the influence of drugs or alcohol.

 The defendant's physical and mental condition is not the critical question in determining if defendant's statements were voluntary. *State v. Schnick,* 819 S.W.2d 330, 337 (Mo. banc 1991). The deficient mental condition of a defendant, "whether manifested by delusional behavior or a positive drug test," *State v. Bucklew,* 973 S.W.2d 83, 90 (Mo. banc 1998), does not by itself render a confession involuntary, "as there is no constitutional right to confess, only when totally rational and properly motivated." *State v. Lyons,* 951 S.W.2d 584, 590 (Mo. banc 1997). "If

one is informed of his right to remain silent under *Miranda,* and understands his right to remain silent under *Miranda,* and thereafter makes voluntary statements, it is absurd to say that such person has not made a knowing and intelligent waiver of his right to remain silent." *State v. Bucklew,* 973 S.W.2d 83, 90 (Mo. banc 1998). The record sufficiently supports the trial court ruling.

### Use of Alias

 Brown argues that the trial court erred by allowing witnesses to refer to him by the name "Thomas Turner." Brown contends that the use of his alias was evidence of other crimes or bad acts and was presented for the sole purpose of painting him as a deceitful, shady character who may be guilty of other crimes not mentioned in this case. The record indicates that the witnesses referred to Brown as Thomas Turner because that was the name he used in St. Louis and that was the name by which they knew him. Even Brown's wife knew him as Thomas Turner and did not know that his name was Vernon Brown.

 The use of an alias does not constitute clear evidence associating defendant with other crimes. *State v. Morrow,* 968 S.W.2d 100, 111 (Mo. banc 1998). *See also State v. Brown,* 902 S.W.2d 278, 287 (Mo. banc 1995). Unless the testimony objected to consists of clear evidence of another crime, there is no trial court abuse of discretion in denying a mistrial. *State v. Simmons,* 955 S.W.2d 729, 737 (Mo. banc 1997). Since the witnesses referred to Brown as Thomas Turner, the record does not support the contention that it was for the purpose of proving that Brown committed other crimes. Witnesses who knew him as Thomas Turner referred to him as such. The trial court did not abuse its discretion.

### Burden of Proof

 Brown alleges that the state shifted the burden of proof to him when it argued as follows in its rebuttal argument:

Here is the evidence that Ms. Kraft introduced. She called exactly two witnesses. She called Danny Blue who testified that on Friday morning, at least I make it fourteen hours after Synetta Ford had already gone to a much better place than that apartment in the basement, fourteen hours after that poor girl was dead and decomposing he saw some man ring all the doorbells at the apartment and act crazy.

Well, you heard it. I don't know what significance you're supposed to draw from the fact that fourteen hours after she was dead someone was ringing the doorbells and acting crazy but that was the State's first – the defense first witness. The only other piece of evidence that Ms. Kraft introduced to you during her entire case was the testimony of this man's first lawyer, Jeff Childress, and you heard that Saturday morning. You may evaluate it for what it was worth.

Mr. Childress said "I went over there in May of 1985 to my client's house and I talked to Kathy Moore and I told her that your husband is going to be released soon, I just want to confirm you don't want to prosecute, do you?" And she said "Why, you know, as a matter of fact I don't, I certainly don't". Now, that's the entire defense case, Danny Blue who saw some events that occurred twelve hours after the poor woman was dead and Jeff Childress, I would argue based on what you heard one of the least most unreliable witnesses to testify in this trial, his presentation speaks for itself.

Brown argues that these comments shifted the burden of proof and were designed to point out that he presented evidence to disprove the crime charged.

■ The state does not improperly shift the burden of proof to defendant by referring to a defendant's failure to offer evidence, so long as the state makes no reference to defendant's failure to testify. *State v. Chaney*, 967 S.W.2d 47, 56 (Mo. banc 1998). *See also State v. Simmons*, 955 S.W.2d 764 (Mo. banc 1997) (prosecutor's comment during guilt phase closing argument in capital murder case that testimony of defense witnesses "didn't carry burden of any kind of persuasion here" did not impermissibly shift burden of proof to defendant). The trial court did not abuse its discretion by overruling the objection to the above comments.

### Impeachment Testimonies

■ Brown argues that the trial court erred when it overruled his motion to present testimony of Patty Scherzinger, a registered nurse at Cardinal Glennon Hospital, and Robert Gerald Clark, a chief protective investigator from the State of Illinois, to impeach the credibility of Brown's stepchildren Christopher Moore, Jason Moore and Tommy Johnson. The stepchildren testified that Brown sexually abused them. Brown alleges that Scherzinger and Clark should have been allowed to testify to statements that the stepchildren made to them about being (or not being) sexually abused by their mother, Kathy Moore. The trial court reasoned that the evidence went to a collateral matter and, therefore, sustained the state's objection to introducing the evidence. The trial court did not err in preventing this collateral issue from being litigated. *See State v. Thomas*, 965 S.W.2d 396, 401 (Mo. App.1998) (trial court did not commit plain error in preventing impeachment of prosecution witness on collateral issue on whether she lied when police first questioned her about staged robbery at restaurant).

### Mistrial

■ Brown contends that the trial court erred when it overruled his motion for mistrial after some of the jurors' hotel rooms were burglarized. Four jurors' hotel rooms were burglarized, and they lost a total of $63.00 in cash, some socks and a bag of snacks. The hotel immediately reimbursed the jurors and fired the persons who were believed to be responsible.

Brown moved for mistrial because the jurors had been victimized. The trial court overruled his motion. Mistrial is a drastic remedy reserved for the most extraordinary circumstances, and the decision whether to grant a mistrial is left to the sound discretion of the trial court. *State v. Barnett*, 980 S.W.2d 297, 305 (Mo. banc 1998). The jurors were immediately fully compensated for their losses. There was no apparent indication that the jurors were biased against Brown because other individuals burglarized their hotel rooms. The trial court did not err in overruling Brown's motion for mistrial because no circumstances existed warranting a mistrial.

### Expert Hearsay Testimony in Penalty Phase

■ Brown claims that the trial court abused its discretion when it sustained the state's objections to the testimony of Jill Miller, a forensic social worker, regarding statements that he made to her. Brown alleges that his expert, Miller, was precluded from presenting essential mitigating evidence to assist the jury in its determination of punishment.

■ Expert testimony should be excluded if it does not assist the jury or if it unnecessarily diverts the jury's attention. *State v. Lawhorn*, 762 S.W.2d 820, 823 (Mo. banc 1988). Admission of expert testimony is within the discretion of the trial court. *State v. Skillicorn*, 944 S.W.2d 877, 891 (Mo. banc 1997). Generally, an expert may rely on hearsay evidence as support for opinions, as long as that evidence is of a type reasonably relied upon by other experts in the field; such evidence need not be independently admissible. *State v. Kelley*, 945 S.W.2d 611, 615 (Mo.App.1997).

Miller was asked to investigate Brown's background. While she was testifying as to what she found, the state objected to some of the reports. The state objected to Miller testifying that Brown had a head injury as a child, that he had headaches,

and that he was sexually abused when he was five years old, on the ground that the statements were hearsay. The trial court sustained the objection. The state argues that Miller was called to testify about what people had told her and about other things that she had read, so that Brown would not have to call those persons and subject them to cross-examination or lay foundations for admission of records. In addition, the state contends that Brown should not be allowed to testify through Miller and avoid cross-examination because Miller's recitation of Brown's statements were unrelated to any admissible opinion of Miller. Brown could have presented the same evidence to the jury without having an expert present it for him. Had the evidence been a basis for the expert's opinions, we would find such evidence admissible. But in the circumstances here, the trial court had discretion not to allow such testimony. We find no abuse of discretion by the trial court in excluding the evidence in its proffered form.

### Mitigating Evidence from Unavailable Witness

■ Brown contends that the trial court abused its discretion in the penalty phase when it refused to allow his counsel to read into evidence a letter about him that was written by his brother, Darius Turner. Turner was stationed in Saudi Arabia during the Operation Desert Shield as a member of the United States Army at the time of trial. The state objected to the introduction of the letter because the letter is inadmissible hearsay that was unreliable. Brown alleges that the letter should have been read into evidence pursuant to *State v. Phillips*, 940 S.W.2d 512, 517–518 (Mo. banc 1997), and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). The determination of reliability is left to the trial court judge who was uncertain as to the authenticity of the letter. We uphold his ruling and note that even if he was wrong about the letter's reliability,

its exclusion does not in the context of this case seem prejudicial.

### Ineffective Assistance of Counsel

■ Brown contends that the Rule 29.15 motion court erred when it overruled his post-conviction motion because his trial counsel was ineffective. Brown alleges that trial counsel was ineffective for (1) failing to establish a "rapport" with him and (2) informing the venirepersons during voir dire about his conviction and death sentence for the murder of Janet Perkins. The Court will review the motion court's overruling of a post-conviction relief motion only to determine whether the findings and conclusions are clearly erroneous. *Sams v. State*, 980 S.W.2d 294, 296 (Mo. banc 1998). The motion court's findings and conclusions are clearly erroneous only if, after the review of the record, the appellate court is left with the definite and firm impression that a mistake has been made. *Id.* Appellant's trial counsel is constitutionally ineffective if counsel's performance fell below the degree of skill, care and diligence of a reasonably competent attorney and the defendant was prejudiced by the defective performance. *Id.*

### A.

### "Rapport" with Brown

■ Brown alleges that his trial attorneys were ineffective because they did not establish a rapport with him. Had his defense attorneys established a rapport with him, Brown says, they could have encouraged him to be evaluated and, thus, obtained expert testimony in the penalty phase. The record indicates that Brown's main counsel was the head of the public defender's capital litigation unit and one of the most experienced attorneys in the unit. Brown's main counsel repeatedly met with him, she met with Brown's friends, and she made two trips to Indiana to meet with Brown's family members. Brown's counsel attempted to get Brown to cooperate with mental experts, but Brown refused. The record sufficiently supports the mo-

tion court ruling that Brown's counsel acted reasonably and was competent.

### B.

### Information About Brown's Conviction for the Murder of Janet Perkins

■ Brown alleges that his trial counsel was ineffective because, during voir dire, she informed venirepersons that he had been convicted and sentenced to death for the death of Janet Perkins. Brown argues that the disclosure was not a part of any "reasonable" trial strategy but operated to convince the jury that he was guilty of the present crime and would have been reversible error had this evidence been adduced by the State. Brown further alleges that "the prejudicial effects of trial counsel's disclosure could not be overcome when it was coupled with the cumulative errors that occurred throughout the trial."

The motion court found that this was a matter of trial strategy. Defense counsel disclosed Brown's other murder conviction to make sure that the venirepersons would not automatically impose the death penalty when they found out about it. Also, at the postconviction hearing, Brown's counsel testified that she disclosed the murder conviction, because her strategy in the guilt phase of Brown's trial involved the use of his confession to the murder of Janet Perkins to try to explain and discredit Brown's confession to the murder of Synetta Ford. She informed Brown of her strategy and he did not object. It is not ineffective assistance of counsel to make a reasonable trial strategy decision. *Sams v. State*, 980 S.W.2d 294, 296 (Mo. banc 1998). The motion court did not err in finding that Brown's counsel was not ineffective.

### Nonstatutory Mitigating Circumstances Instruction

■ Brown argues that the trial court erred when it refused to submit his pro-

posed Instruction A, a non-MAI instruction. Brown contends that "it is fundamentally unfair to allow the state to list nonstatutory aggravating circumstances, MAI–CR3d313.41, and to refuse to allow the defense to list nonstatutory mitigating circumstances." The statute in effect at the time of Brown's trial provides:

1. In all cases of murder in the first degree for which the death penalty is authorized, the judge in a jury-waived trial shall consider, or he shall include in his instructions to the jury for it to consider:

(1) Any of the statutory aggravating circumstances enumerated in subsection 2 of this section which are requested by the state and supported by the evidence;

(2) Any of the statutory mitigating circumstances enumerated in subsection 3 of this section which are requested by the defendant and supported by the evidence;

(3) Any mitigating or aggravating circumstances otherwise authorized by law and supported by the evidence and requested by a party including any aspect of the defendant's character, the record of any prior criminal convictions, and pleas and findings of guilty and admissions of guilt of any crime or pleas of nolo contendere of the defendant;

(4) All evidence received during the first stage of the trial.

Section 565.032, RSMo 1986.

This section, as amended in 1993, partially provides: "if the trier is a jury, it shall not be instructed upon any specific evidence which may be in aggravation or mitigation of punishment, but shall be instructed that each juror shall consider any evidence which he considers to be aggravating or mitigating." While the new section prohibits instructing the jury on nonstatutory aggravating or mitigating circumstances, the old section did not categorically prohibit instructing the jury on nonstatutory aggravating or mitigating circumstances. Nevertheless, prior to the 1993 amendment, this Court required the trial courts not to list nonstatutory mitigating circumstances in the instruction. *State v. Copeland*, 928 S.W.2d 828, 854 (Mo. banc 1996); *State v. Wise*, 879 S.W.2d 494, 518 (Mo. banc 1994); *State v. Whitfield*, 837 S.W.2d 503, 514 (Mo. banc 1992); and *State v. Wacaser*, 794 S.W.2d 190, 195 (Mo. banc 1990). In *State v. Wacaser*, *supra*, this Court stated:

There is no requirement that the instructions list nonstatutory mitigating circumstances. The court on retrial should not list any nonstatutory mitigating circumstances in the instructions, because the inclusion of some might lead the jury to believe that it may not consider others. The defendant is not confined by the instructions as to the evidence and argument which may be presented in mitigation.

Thus, the trial court did not err in excluding Brown's proposed non-MAI instruction.

**Aggravating Circumstance**

■ Brown argues that the trial court erred when it failed to strike aggravating circumstance A submitted by the state. The aggravating circumstance was that the murder was committed by a person with a serious assaultive criminal conviction. Brown contends that the state failed to prove that the "conviction was seriously assaultive." Brown admits that the Court rejected his argument in *State v. Brown*, 902 S.W.2d 278, 293–294 (Mo. banc 1995), but he respectfully requests the Court to reconsider its opinion. Brown was convicted of assault and battery with intent to gratify sexual desires in 1973, in Indiana. In *State v. Kinder*, 942 S.W.2d 313, 332 (Mo. banc 1996), this Court reaffirmed its decision in *State v. Brown*, *supra*, and stated: "The proper line between serious assaultive offenses and other assaultive offenses is the line between felonies and misdemeanors. The former are serious assaultive offenses and the latter are not." The trial court did not err in overruling Brown's objection.

## Proportionality Review

Brown contends that his death sentence is disproportionate under section 565.035, RSMo 1994, and that this Court's application violates his constitutional rights. Brown alleges that Missouri's death penalty scheme is unconstitutional because prosecutors have discretion in seeking the death penalty, no legitimate governmental interest exists for the death penalty, and the database is inadequate. These allegations have been repeatedly rejected by this Court. *State v. Barnett*, 980 S.W.2d 297, 309 (Mo. banc 1998); *State v. Jones*, 979 S.W.2d 171, 186 (Mo. banc 1998); and *State v. Basile*, 942 S.W.2d 342, 361 (Mo. banc 1997).

## Guilt-phase and Penalty-phase Instructions

Brown contends that the trial court erred when it submitted to the jury guilt-phase Instruction 4 and penalty-phase Instruction 3 because those instructions improperly defined "beyond a reasonable doubt." Brown alleges that the "firmly convinced" language in those instructions suggests a higher degree of doubt than is constitutionally required. This Court has repeatedly rejected this claim because "the phrase 'firmly convinced' is essentially synonymous with the phrase 'beyond a reasonable doubt.'" *State v. Barnett*, 980 S.W.2d 297, 305 (Mo. banc 1998).

## Independent Review Under Section 565.035.3

■ This Court is required to review the sentence of death under section 565.035.3, RSMo 1994. The statute provides that:

3. With regard to the sentence, the [S]upreme [C]ourt shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

*Id.*

The record does not indicate that the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. The evidence presented in this case sufficiently supports the jury's finding of two statutory aggravating circumstances. The jury determined that Brown was convicted of assault and battery with intent to gratify sexual desires on June 28, 1973, in the Criminal Court of Marion County of Indiana. Moreover, the jury determined that the murder of Synetta Ford involved torture and depravity of mind. The jury was instructed in specific terms on finding depravity of mind:

"You can make a determination of depravity of mind only if you find that defendant committed repeated and excessive acts of physical abuse upon Synetta Ford and the killing was therefore unreasonably brutal."

The record indicates that Brown invaded Ford's apartment and brutally murdered her by strangling her to death with an electrical cord and stabbing her in the chest and neck with a large butcher knife.

■ Finally, the sentence in this case was not excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence and the defendant. This case is similar to other cases in which the death penalty was imposed. A sentence of death has often been imposed when the murder involved acts of brutality and abuse that showed depravity of mind. *See, e.g., State v. Barnett*, 980 S.W.2d 297, 310 (Mo. banc 1998); *State v. Taylor*, 929 S.W.2d 209 (Mo. banc 1996); *State v. Tokar*, 918 S.W.2d 753 (Mo. banc 1996). Also, the

Court has upheld death sentences where the defendants who were sentenced to death had prior murder convictions. *See, e.g., State v. Wise,* 879 S.W.2d 494, 525 (Mo. banc 1994); *State v. Pollard,* 735 S.W.2d 345, 349–350 (Mo. banc 1987); and *State v. Guinan,* 732 S.W.2d 174, 178 (Mo. banc 1987). The evidence of Brown's guilt is very strong.

## Conclusion

For all of the foregoing reasons, the judgments are affirmed.

PRICE, C.J., LIMBAUGH, COVINGTON, HOLSTEIN, and BENTON, JJ., and McHENRY, Special Judge, concur.

WHITE J., not participating.