# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 02-1845

———————

| | |
|---|---|
| Vernon Brown, | * |
| | * |
| Appellant, | *  Appeal from the United States |
| | *  District Court for the |
| v. | *  Eastern District of Missouri. |
| | * |
| Allen D. Luebbers, | * |
| | * |
| Appellee. | * |

———————

Submitted: April 14, 2004
Filed: June 15, 2004 (Corrected June 17, 2004)

———————

Before LOKEN, Chief Judge, RICHARD S. ARNOLD, BOWMAN, WOLLMAN, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, and COLLOTON, Circuit Judges, En Banc.

———————

BOWMAN, Circuit Judge.

In 1991, a jury convicted Vernon Brown in Missouri state court for the 1985 strangulation death of Synetta Ford. He was sentenced to death. His consolidated direct appeal and post-conviction challenges in the Missouri Supreme Court were unavailing. State v. Brown, 998 S.W.2d 531 (Mo.) (en banc), cert. denied, 528 U.S. 979 (1999). His 28 U.S.C. § 2254 petition in the District Court[1] raising thirty-one

_____

[1]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

grounds for relief was denied, but the court granted a certificate of appealability on eleven grounds. A panel of this Court affirmed the District Court in part but granted the writ on one of Brown's claims challenging his sentence. Brown v. Luebbers, 344 F.3d 770 (8th Cir. 2003).

Both Brown and Allen D. Luebbers (representing the State) filed petitions for rehearing with suggestions for rehearing en banc. We requested from Brown a supplemental response addressing the appropriate standard of review to apply to the issue upon which the writ had been granted. After receiving the response, the panel denied both petitions for rehearing. The Court en banc rejected Brown's suggestions for reconsideration by the full Court but granted an en banc rehearing to the State.

The claim in question concerns a letter that Brown's defense counsel sought to have read into evidence during the penalty phase of Brown's trial for the Ford murder. Counsel represented to the trial court that the letter was from Darius Q. Turner, Brown's younger brother, and had been sent to Brown's counsel in the public defender's office. According to the letter, Turner, a sergeant in the United States Army, was deployed in Saudi Arabia in Operation Desert Shield at the time of Brown's sentencing. As a result, he was unable to be present in the courtroom to testify. In the letter, Turner noted the love and understanding between him and his brother and recounted how Brown had protected Turner from bigger boys when Turner was a child. As for their relationship as adults, Turner expressed regret for not staying in touch and told his brother that the telephone calls and letters from Brown meant more to him than those he received from others. Finally, he implored those who might read the letter to let God's law decide Brown's fate. The trial court excluded the letter as hearsay.

We now affirm the District Court's denial of relief on all grounds. In doing so, we adopt the holdings and reasoning of the panel opinion, except for Part VIII and the result.

# I.

Under 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, a decision by a state court "with respect to any claim that was adjudicated on the merits in State court proceedings" is entitled to deference by the federal courts. 28 U.S.C. § 2254(d). That is, we look only to see if such adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(1), (2). AEDPA effected a move toward greater deference in the § 2254 courts' review of state-court decisions. See Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997) (noting "§ 2254(d)'s new, highly deferential standard for evaluating state-court rulings").

But as the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to Brown's claim. The claim must have been "adjudicated on the merits" in state court. The majority (and the dissent, for that matter) in the panel opinion for the Court concluded that Brown's constitutional claim regarding the Turner letter had not, in fact, been adjudicated on the merits in state court.[2] So the first question for us to

_____

[2]This is what the Missouri Supreme Court said in deciding Brown's claim of state-law error as well as his claim that the exclusion of the letter violated his rights under the Due Process Clause:

Brown contends that the trial court abused its discretion in the penalty phase when it refused to allow his counsel to read into evidence a letter about him that was written by his brother, Darius Turner. Turner was stationed in Saudi Arabia during the Operation Desert Shield as a member of the United States Army at the time of trial. The state objected to the introduction of the letter because the letter is

-3-

consider is: what constitutes an adjudication on the merits? From the plain language of the statute and black-letter law, we know that the state court's decision must be a judgment—an adjudication—on a substantive issue—the merits (as compared with a procedural or technical point). A survey of opinions from our sister circuits demonstrates that, beyond these two considerations, resolving the question is not so easy. One thing is clear—no court has established bright-line rules about how much a state court must say or the language it must use to compel a § 2254 court's conclusion that the state court has adjudicated a claim on the merits. That is as it should be, given one court's difficulty in divining the thought processes of another based only on language being used in certain ways, not to mention the comity issues that would be raised. Cf. Coleman v. Thompson, 501 U.S. 722, 739 (1991) (noting in discussion of procedural default in state habeas cases that the Court has "no power to tell state courts how they must write their opinions" so that reviewing "federal courts might not be bothered with reviewing state law and the record in the case"). We must simply look at what a state court has said, case by case, and determine whether the federal constitutional claim was considered and rejected by that court.

After careful reflection upon the adjudication issue in this case, we now conclude that Brown's constitutional claim was indeed adjudicated on the merits in state court, on two independent grounds, and that the AEDPA § 2254(d) standard of review should apply.

---

inadmissible hearsay that was unreliable. Brown alleges that the letter should have been read into evidence pursuant to State v. Phillips and Green v. Georgia. The determination of reliability is left to the trial court judge who was uncertain as to the authenticity of the letter. We uphold his ruling and note that even if he was wrong about the letter's reliability, its exclusion does not in the context of this case seem prejudicial.

State v. Brown, 998 S.W.2d 531, 549–50 (Mo.) (en banc) (citations omitted), cert. denied, 528 U.S. 979 (1999).

In Brown's consolidated appeal, the Missouri Supreme Court, at the very least, acknowledged that a federal constitutional claim was before it when it said, "Brown alleges that the letter should have been read into evidence pursuant to State v. Phillips, 940 S.W.2d 512, 517–18 (Mo. banc 1997), and Green v. Georgia, 442 U.S. 95 (1979)" (per curiam). Brown, 998 S.W.2d at 549. Phillips, a Missouri death penalty case, concerned a Brady[3] issue raised in the petitioner's consolidated appeal. The State had argued that the Brady issue was of no consequence because the statement in question was hearsay and would not have been admitted into evidence even if it had been disclosed. The Phillips court, in the pages cited by the Missouri Supreme Court in Brown, analyzed the question under Green and concluded that the testimony was highly relevant and reliable, and it should have been admitted.

In Green, also a capital case, the hearsay at issue was the testimony of a witness given at the trial of Carzell Moore, who was indicted on the same charges of murder and rape as Green, the petitioner. Moore and Green were tried separately. The witness testified in Moore's trial, the first to be held, that Moore, Green's alleged partner in crime, had confessed to him, the witness. According to the testimony, Green was not present when the victim was murdered. The testimony was excluded from Green's later trial as hearsay. The Supreme Court did not second-guess the state court's evidentiary ruling that the testimony was hearsay but held that "its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." Green, 442 U.S.

---

[3]Brady v. Maryland, 373 U.S. 83 (1963) (prosecutorial suppression of evidence favorable to the accused).

at 97 (citing <u>Lockett v. Ohio</u>, 438 U.S. 586, 604–05 (1978) (plurality opinion); <u>id.</u> at 613–16 (opinion of Blackmun, J.)).[4]

It is true that the bulk of the Missouri Supreme Court's brief discussion of Brown's claim was devoted to the state-law evidentiary question and whether "the trial court abused its discretion" in excluding the letter. <u>Brown</u>, 998 S.W.2d at 549. But the "summary nature" of the discussion of the federal constitutional question does not preclude application of the AEDPA standard. <u>James v. Bowersox</u>, 187 F.3d 866, 869 (8th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1143 (2000). Here, the Missouri Supreme Court cited cases applying the relevant constitutional rule and held against Brown on the question of reliability. Under <u>Green</u>, absent a determination that "substantial reasons" exist to assume the reliability of the evidence in question, it will not be a due process violation for a court to decline to admit the evidence. The citation to the relevant law and the invocation of "reliability" in the opinion are enough to persuade us that the Missouri Supreme Court adjudicated the due process claim on the merits. That is not to say that citation to law and a key word from the application of that law—or anything else—is required for us to determine that the claim was adjudicated on the merits. We only hold that they suffice in this case for us to conclude that the Missouri Supreme Court's decision on this claim was an adjudication on the merits.

---

[4]In <u>Lockett</u>, the petitioner challenged a state death penalty statute that "did not permit the sentencing judge to consider, as mitigating factors, [the petitioner's] character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime." 438 U.S. at 597 (plurality opinion). The Court concluded that the Constitution requires "that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." <u>Id.</u> at 604.

B.

We further conclude that the Missouri Supreme Court adjudicated Brown's federal constitutional claim on the merits in an alternative holding. Following its references to Green and the reliability of the letter, the court said, "We . . . note that even if [the trial judge] was wrong about the letter's reliability, its exclusion does not in the context of this case seem prejudicial," Brown, 998 S.W.2d at 549–50, a conclusion that is an application of the harmless-error standard set forth in Chapman v. California, 386 U.S. 18 (1967).[5] In Chapman, the Court held that certain federal constitutional errors made in state-court criminal trials could "be deemed harmless, not requiring the automatic reversal of the conviction" if the errors are shown to be harmless "beyond a reasonable doubt." 386 U.S. at 22, 24. Again, there are no "magic words" that must be invoked before we can conclude that the Missouri Supreme Court decided that any error was harmless beyond a reasonable doubt. But here, the state court's use of "prejudicial" signals to us the application of the Chapman standard, as the Supreme Court has long considered prejudice in its Chapman harmless-error analyses. See, e.g., Brecht v. Abrahamson, 507 U.S. 619, 636 (1993) ("State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under Chapman . . . ."); Kimmelman v. Morrison, 477 U.S. 365, 382 n.7 (1986) ("Furthermore, when an attorney chooses to default a Fourth Amendment claim, he also loses the opportunity to obtain direct review under the harmless-error standard of Chapman, which requires the State to prove that the defendant was not prejudiced by the error.") (citation omitted); Hopper v. Evans, 456 U.S. 605, 613–14 (1982) ("The preclusion clause did not prejudice respondent in any way, and a new trial is not warranted.") (citing Chapman). On the facts of this case, the state court's determination that the exclusion of the Turner letter

_____

[5]We are assuming that the Chapman harmless-error standard applies here. See Sweet v. Delo, 125 F.3d 1144, 1158 (8th Cir. 1997) (noting Supreme Court cases "implying that harmless-error analysis applies to Lockett errors"), cert. denied, 523 U.S. 1010 (1998).

did not seem "prejudicial" to Brown was sufficient adjudication on the merits to entitle this alternate holding to AEDPA deferential review.

## II.

Having concluded that the standard set out in § 2254(d) as amended by AEDPA applies to Brown's claim, we now consider whether the Missouri Supreme Court's adjudication of the claim resulted in a decision that was contrary to or an unreasonable application of clearly established federal law.[6] We will consider both grounds on which the Missouri Supreme Court decided the constitutional claim. But before we get to the analysis, we must lay out the evidence of aggravating and mitigating circumstances that was before the jury, as that evidence is critical to our legal conclusions here and in Part III.

The jury was instructed on four aggravating circumstances, two statutory and two nonstatutory. The first factor that the jury considered was whether Brown was convicted in 1973 in Indiana on a charge of assault and battery with intent to gratify sexual desires. In fact, the indictment on the charge, read into evidence during the sentencing portion of Brown's trial, accused Brown of fondling and caressing the body of a twelve-year old girl to gratify his own sexual desires. Trial Transcript at 2298. Brown pleaded guilty to the charge.

Next, the jury was instructed to consider whether Brown's murder of Synetta Ford "involved torture and depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman." State v. Brown, Cause No. 861-03056, Legal File Components of the Record on Appeal in the

---

[6]Brown throws the language from § 2254(d)(2), "unreasonable determination of the facts," into his claim, but he does not argue the facts. It appears to us that the underlying material facts are a matter of record and are not disputed.

Missouri Supreme Court at 86. The jury could find depravity of mind only if it found that Brown "committed repeated and excessive acts of physical abuse upon Synetta Ford and the killing was therefore unreasonably brutal." Id. The evidence before the jury was that nineteen-year-old Synetta Ford was found dead in her basement apartment with a knife sticking out of her throat and the electrical cord from a curling iron "tightly knotted around the neck." Trial Transcript at 2043, see also id. at 1662, 1684. The door to her apartment had been forced open. The evidence showed that Brown first strangled her, taking the time to knot the electrical cord around her neck, and then as she was dying he stabbed her in the chest and neck. The stab wound to her neck severed her carotid artery, the major artery in the neck. The jurors saw photographs of Ford's body as it appeared when it was discovered on the floor of her apartment and also an autopsy photograph. In addition, the jury watched a videotape of Brown's confession, where he claimed that Ford had accidentally stabbed herself before and after he strangled her with the cord.

The jury was further charged with deciding whether Brown was convicted of first degree murder in 1988. During sentencing, jurors heard evidence that in October 1986, Brown took nine-year-old Janet Perkins, who was at his home playing with his stepsons, into the basement where he wrapped a cord around her neck and strangled her. The boys heard her screaming as they played upstairs. The body was found near a trash dumpster, wrapped in trash bags, with a rusty coat hanger wrapped around her ankles and one of her arms, so that her knees were drawn up to her body. After Brown was picked up in connection with the Perkins murder and confessed his guilt, he led officers to another dumpster a block from where the body was found. There they found a bag containing Janet Perkins's missing shoe, a yellow plastic raincoat, and some of her school papers. The Ford jury also saw photographs of the little girl's body and watched Brown's videotaped confession to the Perkins murder. Brown was convicted of first degree murder in the Perkins case and sentenced to death.

Finally, the jury was instructed to decide whether Brown committed acts of sodomy on his stepsons Christopher Moore, Jason Moore, and Tommy Johnson, who were about seven, five, and nine years old, respectively, at the time of the abuse to which they testified. Christopher, age eleven at the time of the sentencing, testified that before Brown was arrested for the Perkins murder in October 1986, he would take Christopher alone into the bedroom Brown shared with Christopher's mother and tell him to undress and lie on his stomach on the bed. Brown would undress, put "hair grease" on his penis, and put his penis in Christopher's anus and then in his mouth. Id. at 2262. Brown committed these acts of sodomy on several different occasions. Christopher told no one about the incidents until Brown was in jail because Brown had said that if he told, he "would never see any of [his] brothers or [his] mother again." Id. at 2264. Jason, nine years old when he testified, also explained to the jury how Brown had performed anal sex on him and said that Brown had threatened to "kill us" if he told anyone. Id. at 2288. Thirteen-year-old Tommy Johnson testified that Brown put his penis in Tommy's anus and mouth and that Brown also put his mouth on Tommy's penis. Id. at 2323. The boys said that Brown would commit the acts of sodomy when their mother was not at home, taking them one at a time from playing with their brothers and locking the door so that the boys who were not being victimized at the time could not come in.

The jury found all four aggravating circumstances, unanimously, beyond a reasonable doubt.

Brown's defense team called a number of witnesses who gave mitigating evidence. First, the jury heard from Maggie and Donald Coplen who knew Brown,[7] his wife, and his wife's sons (the children who testified for the State in the penalty phase). They became acquainted in 1981 (four years before the Ford murder, ten

---

[7]The witnesses who testified about relationships they had with Brown in the early 1980s knew him as Thomas Turner.

-10-

years before the trial) at Sunday school. The Coplens testified that the families spent two Christmases together, and Donald Coplen said he and Brown delivered Christmas baskets to the needy one year. They saw each other socially an additional time or two. The Coplens also saw Brown regularly at church until he stopped attending in 1984 and became distant. They did not see him after that, although Maggie Coplen said that she had visited him in the city jail and in state prison and was staying in touch with him. Both Coplens testified that they had not seen Brown physically abuse his wife or her sons during the time that they were in regular contact with him.

Paul Sasser, a retired minister and former director of a homeless center that was affiliated with Brown's church, became acquainted with Brown at the center. Brown began to help Sasser at the homeless center, first as a volunteer, then for a small salary, and lived with Sasser for a while. While working at the center, Brown had protected Sasser from angry or drunk clients who had threatened Sasser. Brown found his future wife and her three sons living on the streets and was concerned for them, according to Sasser, eventually taking them in. Sasser was still in contact with Brown at the time of the trial.

Forensic social worker Jill Miller testified next. She had spent hours talking with Brown, his family, and others who knew him, and she also had reviewed his educational, medical, and correctional records. She noted that Brown had refused educational and neurological testing that she had recommended for her use in preparing her testimony for the sentencing.

From the school records, Miller gleaned that Brown had a borderline IQ, at best, and generally performed two to three grades below his grade level. She testified that he was close to his mother, brothers, and sister growing up, although his mother was strict. He was protective of his younger siblings (he was the oldest), sometimes taking the blame for things they had done so that they would not be punished.

-11-

Personally, she found Brown to be "personable, pleasant, generally cooperative . . . verbal, polite, but . . . very guarded." Trial Transcript at 2415.

The jury then heard the testimony of three corrections officers. The supervisor of social services at the city jail when Brown was held there said Brown had made few requests of the staff and did not get in trouble for fighting. Also testifying were corrections officers from Potosi Correctional Center, where Brown had been incarcerated for about a year and a half before his trial for the Ford murder. A recreation supervisor said that Brown, an inmate worker at the prison, was "cooperative, self-motivated and honest" in the work setting. Id. at 2423. Brown got "along exceptionally well with the staff" but would not have much to do with other prisoners. Id. Another Potosi officer who had substantial contact with Brown from the time Brown arrived testified that Brown was being held in minimum custody (although in a maximum security facility). His behavior was good, he avoided other inmates, and in one case, he literally ran from trouble when a fight broke out.

In addition to the testimony of these live witnesses, Brown's counsel read to the jury joint stipulations as to what the testimony of Janie Brown, Brown's daughter, and Irvin Brimmage, who knew Brown as a teenager in Indianapolis, would be, had those witnesses been present in the courtroom to testify. Janie Brown was born when Brown was seventeen years old. She saw her father occasionally until she was ten, and she had not seen him since. She had, however, started to write to him in prison. Brown never behaved inappropriately around her. Brimmage met Brown when they were teenagers, and they became good friends. Although he was poor, Brown would share whatever money he had. Brown was helpful to older people, and Brimmage never saw him behave inappropriately around children. As a teenager, Brown did not abuse alcohol or drugs.

Finally, there was an audiotape interview with Patricia Beverly, Brown's mother, recorded at her home in Indianapolis late in 1990. She was unable to travel

to St. Louis for the trial because she was totally disabled at the time. She had last seen Brown in 1984 when he came to visit her after she was injured.

Beverly said that Brown was born at home after a problem pregnancy, two months early and following a difficult labor and delivery. He struggled in school, although he enjoyed some sports, ROTC, and wood shop. He eventually quit high school at age 16. Beverly said that she had three other sons, including one who was stationed in Saudi Arabia at the time of the interview, and one daughter. As the oldest, Brown was protective of them as they were growing up, such as when they were threatened by other children going to and from school. Brown tended to the needs of his grandmother after she had a stroke, essentially taking responsibility for her care while Beverly was at work. He was respectful of his grandparents and mother and regularly attended church where his grandfather was the minister.

He married a woman in Indianapolis who already had children, and Beverly said he always treated those children well. After he moved to St. Louis, he would write and call Beverly; he continued to call once or twice a week from prison. As the interview was drawing to a close, Beverly said that she loved Brown, and she asked the jury to spare his life.

A.

We turn first to the state court's Green adjudication. At the outset, we decline Brown's invitation to revisit the trial court's conclusion that the letter was hearsay under Missouri's law of evidence. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991). We assume the state court properly applied state law. All that concern us are issues raised under the United States Constitution.

-13-

In its review, the Missouri Supreme Court left undisturbed the trial court's conclusion that the letter was not reliable, citing Green, which sets out the applicable federal law. Under Green, as we explained in Part I.A, the hearsay evidence in question must be "highly relevant to a critical issue in the punishment phase" and "substantial reasons [must exist] to assume its reliability" before its exclusion will be deemed a due process violation. Green, 442 U.S. at 97. Brown has not shown that the state courts' conclusion is "opposite to that reached by" the Supreme Court in Green or any other case "on a question of law." Williams v. Taylor, 529 U.S. 362, 405 (2000). Likewise, Brown has not directed us to, and we have not found, a Supreme Court case with "materially indistinguishable" facts in which the Court reached a different result. Id. The Missouri Supreme Court decision is therefore not contrary to clearly established federal law.

We note again the brevity of the adjudication and its emphasis on the question of state law. This does not affect our determination that the result is not contrary to federal law. The Supreme Court advises us that the state court need not cite or even be aware of the governing Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). In the "contrary to" analysis of the state court's decision, our focus is on the result and any reasoning that the court may have given; the **absence** of reasoning is not a barrier to a denial of relief. Cf. James, 187 F.3d at 869 ("The summary nature of the [state court] opinion does not affect this [AEDPA] standard of review.").

We now consider whether the decision was the result of an unreasonable application of federal law. The Green standard, the applicable law here, has two parts: relevance and reliability. The Missouri Supreme Court did not specifically address relevance. Indeed, there was no reason to, given its ruling on reliability, as the evidence must be both relevant *and* reliable. Nevertheless, we have considered the question and have determined that it is not an objectively unreasonable

-14-

application of <u>Green</u> and its progeny to conclude on the facts of this case that the letter did not meet the first part of the <u>Green</u> standard, as it was not "highly relevant to a critical issue in the punishment phase." <u>Green</u>, 442 U.S. at 97.

The issue in mitigation, to which the Turner letter would go, was Brown's character. The letter had essentially two messages.[8] First, Turner described how Brown protected Turner and his friends from older boys who chased them home from school, then taught Turner to stand on his "own two feet." The letter conveyed the additional message that Turner loved Brown, although the brothers had been out of touch. Turner said that Brown had "too much good in him to let go of" and that he, Turner, found it "very hard to believe" that Brown was guilty.

We have no quarrel with the general propositions that a defendant's character may be a "critical issue" in the sentencing phase of a death penalty case and that the testimony of relatives as to character may be "highly relevant." Here, however, the situation is different. The only real example of Brown's character that Turner gave, acknowledging that it "might not sound like much," was an incident that occurred years before Brown murdered Synetta Ford, when Brown protected Turner from older boys. It is clear from the letter that Turner had not spent time with his brother since they were much younger, although they had reconnected through telephone calls and letters. We think it is an objectively reasonable application of <u>Green</u> to conclude that stale evidence of a convicted murderer's character, evidence that harkens back to incidents or relationships of years past, well before the murder was committed, is not "highly relevant" to a "critical issue." The degree of relevance is further diminished by the fact that, as described above, the jury had before it other evidence of Brown's character. Indeed, the "aspect of [Brown's] character" suggested by the letter—his

_____

[8]To the extent Brown suggests that the jury would have found mitigating circumstances in Turner's service to his country in the Gulf War, that is, in deeds of Turner that have no relevance to Brown, his crime, his character, or his relationship with Turner, we hold that is not proper mitigation evidence.

-15-

efforts to protect those less able to protect themselves—was before the jury through the testimony of other witnesses. Lockett, 438 U.S. at 604 (plurality opinion). As we noted above, the forensic social worker testified that she had spoken with Brown's family, who described Brown as being "pretty protective of his younger brothers and sister." Trial Transcript at 2413. Brown's mother stated the same thing. Likewise, Paul Sasser testified that Brown protected him from belligerent patrons of the homeless center. That evidence is precisely the sort of evidence that Turner offered in his one memory of his relationship with Brown—Brown's protection of people close to him—and is actually broadened beyond Turner's recollection to include Brown's friend and all of Brown's siblings, not just Turner. Additional character testimony, as recited above, came from witnesses who apparently had more recent and frequent contact with Brown than Turner. Several of those witnesses recalled specific, positive incidents that were more contemporaneous both to the approximate time of the murder and to the time of sentencing. Finally, Turner's love for his brother, his belief in Brown's innocence, and his opinion that "God's law" should decide Brown's fate are subjective feelings that cannot be deemed "highly relevant" under Green to the question of Brown's character, and it would not be objectively unreasonable to so conclude.

On this record, we cannot say that it is an unreasonable application of clearly established law to conclude that the Turner letter was not "highly relevant to a critical issue" at Brown's sentencing.

The Missouri Supreme Court did mention the letter's reliability, deferring to the trial court's uncertainty "as to the authenticity of the letter." Brown, 998 S.W.2d at 549. Under Green, excluding otherwise inadmissible hearsay will result in a violation of due process if the evidence is not only relevant but also "substantial reasons existed to assume its reliability." We hold that the circumstances surrounding the letter do not make it contrary to or an unreasonable application of clearly established

-16-

federal law for the state courts to have concluded there were not "substantial reasons . . . to assume its reliability."

The Supreme Court opinion dealing with reliability that Brown cites in his brief is Chambers v. Mississippi, 410 U.S. 284 (1973). At issue in that case was the exclusion of the testimony of three witnesses that someone other than the petitioner had confessed to them the crime for which the petitioner was being tried. The petitioner also alleged that his constitutional right to confront a witness had been violated.[9] The Chambers Court noted that the statements in question "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." Id. at 300 (noting that the statements were spontaneous, made to several people, corroborated, and against interest, and that the person who purportedly made the out-of-court statements was in the courtroom and could be called to testify). Moreover, the witnesses' testimony went directly to the question of guilt or innocence. On the facts of this case, we do not think it is contrary to or an objectively unreasonable application of Chambers (or any other Supreme Court case that we have identified, for that matter) for the state courts to have concluded there were not "substantial reasons" to assume the Turner letter's reliability, that is, that the letter's reliability could not be assured because it was not submitted as a sworn affidavit. We may believe the state courts got it wrong, but that is not our call to make. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court

---

[9]The Supreme Court since Chambers has noted that the opinion "was an exercise in highly case-specific error correction." Montana v. Egelhoff, 518 U.S. 37, 52 (1996) (plurality opinion). The Egelhoff Court went on to say that "the holding of Chambers—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, *in combination*, rise to the level of a due process violation." Id. at 53 (emphasis added).

-17-

decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. We hold that the state courts' decision on the question of reliability is not contrary to or an unreasonable application of Green.

## B.

As for Chapman prejudice, the Missouri Supreme Court had before it the transcript of Brown's trial and sentencing, and noted that its decision was made "in the context of this case." Brown, 998 S.W.2d at 550. As we have demonstrated, there was before the jury extensive evidence of aggravating circumstances, as well as mitigating character evidence to which the Turner letter was cumulative. In addition, as we have said, the jury heard from character witnesses who had more recent contact with Brown, including three correctional officers who testified to his model behavior while incarcerated. The Missouri Supreme Court might have been a bit more forceful in its conclusion, where it stated that the letter's exclusion did not "seem prejudicial." Id. at 550. But we do not think the state court was expressing ambivalence or anything less than an unequivocal conclusion of law, although perhaps not in the strongest terms. In any event, that court's use of "seem" does not make the decision contrary to any Supreme Court precedent. Likewise, we hold that the result of the Missouri Supreme Court's application of the Chapman harmless-error standard, given the record in this case, is not objectively unreasonable.

## III.

If we have misjudged congressional intent and the Supreme Court's interpretation of "adjudicated on the merits" for purposes of § 2254, we nevertheless would hold that the District Court's decision should be affirmed under the pre-AEDPA standard of review. See Robinson v. Crist, 278 F.3d 862, 865 (8th Cir. 2002)

("Because this claim apparently was not adjudicated by the [state] court, we likely should apply the pre-AEDPA standard of review.").

We have gone to some lengths in Part II of our opinion to describe the law applicable to Brown's claim and the facts related to it in order to explain why we reject his claim that the Missouri Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law. Little more needs to be said here. For the reasons we have already explained in some detail, we do not think Brown has shown that the Turner letter was "highly relevant to a critical issue" in his sentencing. While we may be less certain under the pre-AEDPA standard of review about the state courts' decision that Brown failed to show "substantial reasons" to conclude that the letter was reliable, we need not decide the question because the relevance standard cannot be met.

In any event, we are confident that the exclusion of the letter was harmless beyond a reasonable doubt. "A constitutional error is harmless when 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" Mitchell v. Esparza, 124 S. Ct. 7, 12 (2004) (citations to quoted cases omitted). As we have explained, the Turner letter's statements, to the extent they may be relevant, were cumulative to evidence as to Brown's character that was already before the jury. Moreover, the evidence of aggravating circumstances was devastating. This is not a case, like Chambers, where the evidence in question was highly relevant to actual guilt or innocence. The Turner letter was not offered to prove that Brown was actually innocent, either of the crime or of the death penalty. Here, Brown received the constitutionally required "individualized consideration" before the death penalty was imposed. Lockett, 438 U.S. at 605 (plurality opinion). In these circumstances, we are convinced beyond a reasonable doubt that the admission of the letter would not have altered the jury's decision to impose the death penalty on Brown, and thus its exclusion was harmless error at most.

-19-

The judgment of the District Court denying the writ on any and all of Brown's claims is affirmed.

WOLLMAN, Circuit Judge, with whom MURPHY, Circuit Judge, joins, concurring in the judgment.

I agree with the court that because Brown's constitutional claim was adjudicated on the merits in state court, AEDPA's § 2254(d) standard of review should apply. I also agree that any error in excluding the Turner letter was harmless beyond a reasonable doubt.

For the reasons so persuasively advanced in Judge Richard Arnold's dissent, however, I cannot agree that the letter was properly excluded on either relevancy or reliability grounds. Accordingly, I concur in the judgment affirming the denial of the writ.

COLLOTON, Circuit Judge, concurring.

I join the opinion of the court, but add a few points to clarify my views.

It is quite reasonable to ask, as does the dissent, whether the AEDPA-standard issue is properly before the en banc court, if the state did not assert before the three-judge panel that 28 U.S.C. § 2254(d) should apply to review of the state court's adjudications. It must be remembered, however, that as this case first came to the en banc court on a petition for rehearing, a panel of the court already had *reached and decided* the question whether § 2254(d) applied in this case. *Brown v. Luebbers*, 344 F.3d 770, 785 (8th Cir. 2003). At that point, the panel opinion established the law of the circuit on the AEDPA-standard issue, regardless what the parties had asserted in their briefs, and I believe it was properly the business of the en banc court to decide whether the panel opinion should remain the law of the circuit on that issue. If the

-20-

panel opinion merely had reported a concession or waiver by the state in this case, and left the AEDPA-standard issue for another day, then the matter of judicial administration might be resolved differently.

Harmless error analysis is sufficient to resolve this case, but with brief amplification, I also join the court's conclusion that the state court proceedings did not result in a decision that involved an unreasonable application of *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam). With respect to reliability of the disputed letter, it is true that the Missouri Supreme Court referred to the trial court's uncertainty as to the authenticity of the letter, while the trial court did not appear to rely on authenticity in excluding the letter. On the other hand, the trial judge did say that he rejected the letter because it was unsworn hearsay -- "We're not talking about depositions where a man is under oath, you're talking about a letter, plain and simple," (Tr. 2443) -- and the state supreme court said more generally that "[w]e uphold his ruling," which the court said was "about the letter's reliability." *State v. Brown*, 998 S.W.2d 531, 549 (Mo. 1999) (en banc).

If we were reviewing the decision of the Missouri Supreme Court as though it were an administrative agency, then it may well be that the unclear reasoning of the state court would be inadequate to sustain its judgment on the issue of reliability without further explanation. I understand the court, however, to join our sister circuits in rejecting this model of judicial review, which would tend to "place the federal court in just the kind of tutelary relation to the state courts that the recent amendments are designed to end." *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997); *see also Bell v. Jarvis*, 236 F.3d 149, 159 (4th Cir. 2000) (en banc); *Bui v. DePaolo*, 170 F.3d 232, 243 (1st Cir. 1999).

Under AEDPA, the question for a federal habeas court is not whether the state court's opinion is well reasoned, but whether the decision reached in state court proceedings is "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409

-21-

(2000). The rule of reliability established by *Green* is quite general in nature, and state courts thus have a good deal of leeway in reaching reasonable outcomes. *Yarborough v. Alvarado*, No. 02-1684, 2004 WL 1190042, at * 8 (U.S. June 1, 2004). On this understanding, I agree with the court that the decision of the Missouri state courts to exclude hearsay contained in an unsworn letter, while perhaps incorrect if reviewed *de novo*, does not represent an unreasonable application of federal law as determined by the Supreme Court of the United States. *See Buchanan v. Angelone*, 103 F.3d 344, 348-49 (4th Cir. 1996), *aff'd on other grounds*, 522 U.S. 269 (1998); *Alley v. Bell*, 307 F.3d 380, 398-99 (6th Cir. 2002); *Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995).

RICHARD S. ARNOLD, Circuit Judge, with whom BYE and MELLOY, Circuit Judges, join, dissenting.

I respectfully dissent. In my opinion, Vernon Brown is entitled to relief on his habeas corpus petition because during the penalty phase, the trial judge excluded the letter written by Mr. Brown's brother. I would therefore vacate Mr. Brown's sentence. Mr. Brown's conviction would of course stand. Unless the state sought to retry the penalty phase within a reasonable time to be set by the District Court, he would be in prison for life.

I believe the Court is mistaken in concluding that the state trial court made no constitutionally significant errors in the penalty phase of Mr. Brown's trial. In my view, the trial court violated petitioner's rights under both the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment by excluding as hearsay a letter written by his brother, Mr. Darius Q. Turner, who was on active duty in the United States Army serving in the Middle East as part of Operation Desert Shield during petitioner's trial. Petitioner wanted the jury to see the letter as mitigating evidence. This Court discounts both the reliability and relevance of the letter, and I respectfully disagree.

Under the amended AEDPA standard, our Court may grant habeas relief if a state court decision is either contrary to federal law or involves an unreasonable application of federal law. 28 U.S.C.A. § 2254(d). Mr. Brown alleges that the exclusion of the letter violated both the Eighth Amendment and Due Process Clause of the Fourteenth Amendment. In Lockett v. Ohio, 438 U.S. 586 (1978) (plurality opinion), and later cases, the Supreme Court established that the Eighth Amendment guarantees a capital defendant the right to introduce all relevant mitigating evidence in the penalty phase. The Court noted that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604; see also Eddings v. Oklahoma, 455 U.S. 104, 110 (1982). The Supreme Court has also held that the Due Process Clause requires that a state's rules of evidence not be applied mechanically when doing so would preclude the defendant from introducing relevant evidence at the penalty phase. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice."). Thus, the exclusion of hearsay testimony at the penalty phase of a death penalty case violates the Due Process Clause of the Fourteenth Amendment where "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, and substantial reasons existed to assume its reliability." Green v. Georgia, 442 U.S. 95, 97 (1979) (per curiam) (citations omitted).

The first question is whether the AEDPA-standard issue is properly before us as a matter of judicial administration. I think the answer is no, and the procedural history of the case is instructive on the point. In briefs submitted to the three-judge panel that initially cited Brown's case, the state did not assert that it should be governed by the AEDPA standard. In fact, this particular question was not controversial before the panel. Both the panel majority and the dissent (as the Court today acknowledges) hold, or at least assume, that the AEDPA standard does not

apply, because the Missouri Supreme Court had not reached the merits. The first time the applicability of the AEDPA standard was urged was in the state's petition for rehearing en banc. Petitioner was reduced to the last-minute expedient of placing his entire argument on this point in the response to the petition for rehearing en banc on this point. No supplemental briefing was allowed prior to the oral argument on rehearing en banc.

I am not questioning at all the power of this Court to decide the issue. Courts often (sometimes too often, it seems) decide issues that are somewhat irregularly before them — for example, an issue not properly raised in the court below. But that is certainly not the normal practice. I am not saying that proceedings before three-judge panels are analogous in every respect to proceedings in lower courts, but there is a certain similarity. The state, like petitioner, should be required to come with all of its guns loaded the first time. This it has not done. Instead, it has saved one bullet. I do not think this practice should be encouraged, even though the effect of the argument is to affirm the judgment of a district court.

Assuming we decide the standard-of-review question, what is the answer? The standard set out in AEDPA — that the holding of the state court cannot be set aside unless it was contrary to clearly established law as set forth in opinions of the Supreme Court of the United States, or was unreasonable in light of the facts in the state-court record — is crucial here. This standard, more difficult for habeas petitioners, comes into play, however, only if the state court decided the federal constitutional issue on its merits. In deciding this question, it is critical to examine closely the opinion of the Supreme Court of Missouri. In my view, the Missouri Supreme Court did not clearly decide the case on federal grounds.

The relevant passage from the opinion of the Missouri Supreme Court is set forth by this Court ante, at 3-4 n.2. The Court rightly recognizes two separate legal issues: whether the letter was unreliable, and whether its exclusion was prejudicial.

-24-

As to unreliability, the opinion clearly reads, with the exception of a citation to Green, like a garden-variety state-evidence-law issue. The first sentence of the quoted part of the Missouri Supreme Court opinion says: "Brown contends that the trial court abused its discretion in the penalty phase when it refused to allow his counsel to read into evidence a letter about him that was written by his brother, Darius Turner." State v. Brown, 998 S.W.2d 531, 549 (en banc), cert. denied, 528 U.S. 979 (1999). The state court does not explain what it believes Green stands for, or how it helps the position taken by the State of Missouri. I believe a habeas petitioner is entitled to a more thorough answer. Indeed, it must have been with such a situation in mind that Congress included the "on the merits" language. The more attention the state court appears to have given the federal issue, the more its decision is entitled to respect. As to the prejudice holding, I do not see any "holding," properly so called, at all in the state court's opinion. The Missouri Supreme Court's discussion of prejudice says only that admission of the letter did not seem prejudicial. This is not a holding, but simply an off-the-cuff observation made in passing.

So we come to the merits, applying, according to my way of thinking, pre-AEDPA law. In my opinion, regardless of whether the letter constituted hearsay, its exclusion violated Mr. Brown's due-process rights. The Green standard involves a two-part inquiry, requiring a court to determine whether evidence relevant to a critical issue at the punishment phase is both relevant and reliable. Green, 442 U.S. at 97. If such evidence is both relevant and reliable, its exclusion at the punishment phase is reversible error. Ibid. Here, the letter was highly relevant to a critical issue, petitioner's character, at the punishment phase and no substantial reasons existed not to assume its reliability.

This Court acknowledges that the Missouri Supreme Court did not specifically address relevance. This notwithstanding, this Court concludes that the letter was not relevant to a critical issue because the letter contained "stale evidence" of petitioner's relationship with his brother. I disagree with this characterization of the contents of

-25-

the letter, and do not join the Court in its conclusion that "evidence that harkens back to incidents or relationships of years past, well before the murder was committed, is not 'highly relevant' to a 'critical issue.' " Indeed, if courts were to follow this standard, I doubt that much mitigating evidence of a defendant's character could ever be admitted. No better method of describing a person's character likely exists than by recounting incidents and interactions of years past.

The Court also intimates that the character evidence contained in the letter was repetitive of other evidence already before the jury. I disagree with this conclusion. It appears from the letter's contents that petitioner and his brother shared a unique, although often distant, relationship that was unlike that which he shared with any other witness whose testimony was admitted. Furthermore, I am convinced that its effect on the jury would have been greater than the other mitigating evidence petitioner presented. Mr. Turner was not only a member of the armed services on active duty, he was also serving in the Gulf War, and over and over again during the trial, on the record, and in the presence of the jury, the Court praised the performance of our troops in the Gulf War. Theirs is the highest example of patriotism, the Court says. But the minute the defendant adduces evidence of this kind in his favor, the Court takes a completely different stance. I think the jury's opinion of Mr. Brown might well have risen dramatically if it had known about the letter.

As to the reliability of the letter, this Court refers to the Missouri Supreme Court's deference to the trial court's uncertainty of the letter's authenticity. I am troubled by this. The Missouri Supreme Court appears to defer to a finding that was not made by the trial judge. When the prosecution objected to the admission of the letter, the trial judge relied on state evidence law, not lack of authenticity, to exclude the letter. Specifically, the trial judge stated: "I have no problems with the authenticity of [the letter] except that it's just not admissible even if this was an affidavit. The law is clear even an affidavit in the absence of a consent by both parties is not admissible, now that's evidentiary law." Tr. 2443. I am unpersuaded

-26-

that the trial judge believed the letter was unauthentic and find no basis upon which it would be considered unauthentic. Furthermore, the letter's return address was to "SFC Darius Q. Turner, HLM 801st MAINT BN, 101st ABN DIV (AASLT), APO NY 09309" and the letter's postmark indicates that it was sent from the United States Army. I therefore believe that "substantial reasons existed to assume [the letter's] reliability" and that due process required its admission because it was highly relevant to a critical issue. Green, 442 U.S. at 97.

The exclusion of Mr. Turner's letter was not harmless. "A constitutional error is harmless when 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained".' " Mitchell v. Esparza, 124 S. Ct. 7, 12 (2004) (internal quotations omitted). The critical issue in the penalty phase of Mr. Brown's trial was his character. The State of Missouri aimed to convince the jury that petitioner was a bad person. Petitioner's attorneys, on the other hand, attempted to prove that although he had committed bad acts, petitioner was a man whose life was worth saving. Mr. Turner's letter seems highly relevant in itself, and it would have been even more compelling than the other mitigating evidence because its author was a member of the armed services on active duty in time of war. Thus, I conclude that the exclusion of Mr. Turner's letter violated Mr. Brown's rights under the Eighth and Fourteenth Amendments and that, upon applying the proper prejudice standard, the exclusion was not harmless.

_____